IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | 2:07cr54 |
| ) | Electronic Filing |
| JAMES SED ) | |

**MEMORANDUM ORDER**

AND NOW, this 11th day of July, 2008, upon due consideration of [79] defendant James Sed's Motion to Suppress Evidence and Dismiss Count Four and the parties' submissions in conjunction therewith, IT IS ORDERED that the motion be, and the same hereby is, denied.

The central issue raised is whether the Pennsylvania State Police violated the Fourth Amendment when they effectuated an extra-jurisdictional arrest of defendant Sed and his co-defendants during the course of a large drug transaction. Defendant was arrested within one hundred yards of the Pennsylvania border while in the process of purchasing five ounces of crack cocaine as part of a controlled-purchase transaction that originated in Pennsylvania. The transaction occurred seven days after Sed delivered two ounces of crack cocaine under substantially similar circumstances. Defendant advances a line of authority which posits that an arrest by a police officer outside his or her jurisdiction is an arrest without legitimate authority and therefore is unreasonable. The government maintains that the Supreme Court's recent opinion in Virginia v. Moore, 128 S. Ct. 1598 (2008), is controlling and the arrest must be upheld as long as the officers had probable cause to support it, which they undisputably did. While the government's position is not without force, we need not grapple with the outer precedential reach of Moore because defendant's arrest was reasonable under the traditional standards used to evaluate police conduct and therefore did not violate the Fourth Amendment in any event.

The factual backdrop of Sed's arrest is not in dispute. On April 21, 2006, Pennsylvania State Trooper Poulus was working in an undercover capacity and met with a confidential informant ("CI"), James Sed, and defendant Stacey Hickman to conduct a crack cocaine transaction. Pennsylvania State Police Officer Corporal Wiles and the CI drove to Elise's Café, located in Sharon Pennsylvania near the Pennsylvania-Ohio border. Trooper Poulus also drove there and he and the CI met Sed and Hickman. Trooper Poulus gave Sed $2,400 in cash in order to purchase two ounces of crack cocaine. Sed and Hickman drove to the "Standard Market" located a short distance across the border where Sed obtained the drugs from defendant Mark Grannison. Sed returned to Trooper Poulus's car and handed him what lab testing later confirmed to be nearly fifty six grams of crack.

Six days later Trooper Poulus attempted to set up a purchase for five ounces of crack, which was planned as a buy-bust operation. Poulus notified Sed that he wanted to buy the larger quantity of crack but stated he did not want to relinquish control of the $5,000 until the crack was obtained. Poulus told Sed he wanted the transaction to occur at the Shenango Valley Mall in Hermitage, Pennsylvania. Shortly before the transaction was to occur Sed advised that the deal would have to occur at the previous location and in a substantially similar manner. Poulus then demanded that he at least be near the money in order to see where it was going.

The second deal took place under the same circumstances as the first. Trooper Poulus drove to the parking lot of the Elise's Café and gave Sed and Hickman $5,000. Sed left with the money. Grannison drove his car around the parking lot of the café in Pennsylvania to view Trooper Poulus and then proceeded to the Ohio market where Sed and Hickman were waiting. Sed entered Grannison's vehicle while Hickman stayed behind. Grannison essentially drove around while conducting the exchange. At one point Grannison was heading back toward Pennsylvania and Corporal Wiles believed the vehicle had re-entered Pennsylvania. He then gave the order to stop the vehicle and arrest the occupants. When the stop was effectuate Grannison was in the driver's seat with the cash in his lap, while an open white paper bag containing a plastic baggie with what appeared to be crack was found behind the front passenger seat were Sed was sitting.

Sed and Grannison were arrested and transported to the Sharon Police Department, which is located within one mile from the scene of the arrest. During the transport a discussion among the troopers raised concerns about whether the arrest had occurred in Ohio. Corporal Wiles stated that based upon his understanding of where the border was located he believed it had occurred in Pennsylvania. At the station Sed was processed and read his Miranda rights. He then gave a full confession. The vehicle was toed and a search warrant was obtained for its contents. The crack cocaine was seized pursuant to the warrant. A warrant for Grannison's residence was also obtained and executed.

Sed's motion is premised on the notion that the Pennsylvania State Police officers acted outside their lawful jurisdiction and thus exceeded their authority under state law when they arrested Sed. The premise is erroneous. While the arresting officers did violate Ohio's version of the Uniform Act on Fresh Pursuit of Criminals Across State Lines in a manner that would result in the suppression of all evidence gained after the point of arrest under Pennsylvania law, both Ohio and Pennsylvania law recognize that the officers were properly exercising their Pennsylvania law enforcement authority in apprehending Sed for the felony offenses committed and being committed within the state of Pennsylvania.

In <u>Commonwealth v. Sadvari</u>, 752 A.2d 393 (2000), the Pennsylvania Supreme Court considered "the lawfulness of an extraterritorial arrest of a Delaware citizen for an offense occurring in Pennsylvania." <u>Id.</u> at 394. At approximately 2:45 a.m. on the night in question two Pennsylvania State troopers in a marker cruiser observed the defendant Sadvari's vehicle approach from behind at a high rate of speed, abruptly decelerate, then pass the cruiser. The officers stopped the vehicle about four-tenths of a mile after it traveled into Delaware. When a request was made for Sadvari's license and registration, the trooper smelled a strong odor of alcohol and observed Sadvari's slurred speech and blood-shot eyes. Upon questioning Sadvari admitted drinking after work. He was ordered out of the car and thereafter failed two field sobriety tests. At that point he was placed under arrest and taken to a Pennsylvania hospital for chemical testing which revealed a blood alcohol content above the legal limit. <u>Id.</u> at 394-95.

Sadvari moved to suppress all evidence gained from the point of the stop: his statements,

3

the observations of the officers and the blood alcohol test results on the ground that each was the product on an unlawful arrest because the arrest was not conducted in accordance with Section 1933 of Delaware's fresh pursuit statute, which mandates that the arresting out-of-state officer take the arrestee before a justice of the peace of the county where arrest is made "who shall conduct a hearing for the purpose of determining the lawfulness of the arrest." Id. at 395 (quoting Del. Code, Tit. 11, § 1933). Although conceding that the Pennsylvania State Troopers had acted within the authority to arrest conferred upon them by section 1932 of Delaware's fresh pursuit statute, Sadvari argued that suppression of all evidence from the seizure was warranted as a result of the troopers' failure to take him before a Delaware justice of the peace. Id.

The Pennsylvania Supreme Court held that Sadvari's arrest was "illegal" because the troopers failed to follow the condition of Delaware law imposed upon the exercise of their arrest authority, which required them to take Sadvari before a Delaware justice of the peace to pass on the validity of the arrest. Id. at 598. It further adopted the remedy of suppression for such a violation based on the following rationale:

> It remains to determine a remedy. As the Superior Court correctly noted, not every violation of a statute or rule requires suppression. On the one hand, it could be argued that the Delaware statute merely duplicates the framework provided by Pennsylvania law and our procedural rules for safeguarding defendants' constitutional rights; therefore, in individual cases a remedy as exacting as suppression should not be deemed necessary. We find, however, that the Delaware statute, with its directive that an out-of-state officer present the arrestee to a Delaware judicial tribunal for review of the lawfulness of an arrest conducted in Delaware, functions as more than merely an extradition statute, and that a contrary interpretation would render empty the mandate of the Delaware law. The exclusionary rule has previously been employed to ensure the orderly administration of justice where a police officer acts without authority, even in cases in which constitutional rights are not at the forefront. See generally State v. Rizzo, 634 A.2d 392, 402 (Del.Super.Ct.1993) (characterizing the exclusionary rule as a rule of evidence, adopted as an instrument to implement justice, and not standing upon constitutional grounds). Cf. Price, 543 Pa. at 412-13, 672 A.2d at 284-85 (concluding that an FBI agent lacked authority to arrest a defendant for driving under the influence, and that the exclusionary rule barred all evidence obtained as a result of the stop). In this instance, application of the exclusionary rule will serve primarily as a demonstration of comity to vindicate Delaware's sovereignty in light of Pennsylvania's incursion upon this important state interest. Suppression is also appropriate to encourage future compliance with Delaware's procedures and, in a more general sense, to safeguard the individual right to be free from unlawful seizures.

Id. (footnotes omitted).

Having based its ruling in principles of comity and reciprocal respective for separate spheres of sovereignty, the Court carefully circumscribed the remedy to the interest sought to be protected by the section of the Uniform Act on Fresh Pursuit that had been violated: the procedure to be followed after the arrest. Id. at 399-400. After noting that a traffic stop is akin to investigative detention under the Fourth Amendment and that Sadvari had failed the field sobriety tests before being placed under arrest, the Court opined that "the troopers' observations relating to Sadvari's driving, appearance at the time of the stop, and performance of the field sobriety tests were not tainted by the failure to comply with the Delaware statute" and consequently only the evidence of blood alcohol content obtained after the arrest should have been suppressed. Id. at 400.[1]

Here, to the extent defendant's motion is premised on the contention that his arrest was illegal under state law, Sadvari establishes that the arresting officers violated the equivalent section of Ohio's Uniform Act on Fresh Pursuit. To the extent defendant contends his seizure and arrest were illegal because they were extraterritorial actions undertaken without authority, the motion is without merit.

At common law it is well recognized and firmly rooted in tradition that police officers may effect an extra-territorial arrest outside their jurisdiction if they are in "fresh pursuit" of a person that has committed a felony. United States v. Atwell, 470 F. Supp.2d 554, 563 (D. Md. 2004); Doolittle v. State, 154 P.3d 350, 355 (Wy. 2007); Commonwealth v.Shaffer, 710 A.2d 89, 91 n.1 (Pa. Super. 1998) ("Note, however, that at common law an officer may pursue a suspected felon into another jurisdiction in order to effectuate an arrest.") (citing 5 Am. Jur. § 72); Nicholas L. Lopuszynski, FATHER CONSTITUTION, TELL THE POLICE TO STAY ON THEIR OWN SIDE: CAN EXTRA-JURISDICTIONAL ARRESTS MADE IN DIRECT VIOLATION OF STATE LAW EVER CROSS THE FOURTH AMENDMENT'S "REASONABLENESS" LINE?, 53 DePaul L. Rev. 1347, 1369 (Spring

---

[1] The Court further opined that an officer under similar circumstances would have the authority to gather such evidence under the circumstances and would be free to use it provided the arrestee was thereafter taken before a Delaware justice of the peace "without unnecessary delay." Id. at 400 n. 11.

2004). And Pennsylvania has long subscribed to the general principles underlying this area of common law. See e.g. Brooks and Orne v. Commonwealth, 61 Pa. 352, 1869 WL 7591 (Pa. 1869) ("The felon who is seen to commit murder or robbery must be arrested on the spot or suffered to escape. So, although not seen, yet if known to have committed a felony and pursued without warrant, he may be arrested by any person. And even when there is only probable cause of suspicion, a private person may without warrant, at his peril, make an arrest.") (quoting Wakely v, Hart, 6 Binn. 318 (Pa. 1814)).

Fresh pursuit requires that the attempted apprehension of the person be immediate, continuous, and uninterrupted but does not require a "fender-smashing Hollywood-style chase scene" or even the formal type of chase necessary for hot pursuit. Commonwealth v. McPeak, 708 A.2d 1263, 1266 (Pa. Super. 1998) (following Commonwealth v. Magwood, 469 A.2d 115, 118-19 (Pa. 1983). It is recognized as being satisfied whenever an officer's attempted apprehension of a felony suspect was diligently undertaken after the commission of an offense and continued in a manner that was not significantly interrupted. United States v. Getz, 381 F. Supp. 43, 46 (E.D. Pa. 1974).

Analyzing the arrest under the common law exception for fresh pursuit, the troopers witnessed the unfolding of a felony drug transaction that was initiated in Pennsylvania and planned to conclude there. The corporal in charge waited for the suspects to re-enter Pennsylvania before giving the order to initiate a seizure and arrest. Once the order for a "take down" was given, the officers converged from various locations, immediately pursued the suspects and arrested them. As a result, the arrest was immediate, continuos, and uninterrupted, flowing from a seamless interconnected web of criminal activity initiated in Pennsylvania and designed to end with the delivery of drugs there. Thus, Sed was arrested as the result of fresh pursuit and his arrest for felony offenses previously committed and being committed in Pennsylvania was well within the legitimate exercise of police authority under common law. Atwell, 470 F. Supp.2d at 563, Doolittle, 154 P.3d at 355; Lopuszynski, 53 DePaul L. Rev. at 1355-56 & n. 76 (citing David R. Struckhoff, THE AMERICAN SHERIFF 22 (1994)). And the law of Pennsylvania has only expanded upon this traditional exercise of police authority. Cf.

Commonwealth v. Sestina, 546 A.2d 109, 111 (Pa. Super. 1988) ("The purpose of the [the Municipal Police Jurisdiction Act] is to expand, not limit, the power of local police officers to make arrests outside of their primary jurisdictions."), appeal denied, 554 A.2d 508 (Pa. 1989).

Furthermore, the troopers were authorized under Pennsylvania law to arrest Sed in Ohio so long as their actions in doing so complied with Ohio law. Sadvari, 752 A.2d at 398; Shaffer, 710 A.2d at 91. Ohio law authorizes any police officer from another state to pursue and arrest an individual so long as the crime was a felony, it initially occurred in the officer's jurisdiction, and the officer was in fresh pursuit of the individual. Ohio R. C. § 2935.30. The statute codifies the common law doctrine of fresh pursuit. State v. Foster, 396 N.E.2d 246, 255 (Ohio Com. Pl. 1979)(citing Ohio R. C. § 2935.29); State v. Anderson, 346 N.E.2d 776, 777 (Ohio 1976). As a result, both Pennsylvania and Ohio authorized the troopers to effectuate the extra-territorial arrest based upon the common law doctrine of fresh pursuit of an individual who was in the process of committing a felony offense within Pennsylvania.

Moreover, even assuming the troopers violated state law after arresting defendants in Ohio, it is widely recognized that a violation of state law does not in itself make an arrest unconstitutional for Fourth Amendment purposes. United States v. Laville, 480 F.3d 187, 192 (3d Cir.2007) (an arrest in violation of state law does not per se result in a Fourth Amendment violation); Christopher v. Nestlerode, 240 Fed. Appx. 481, 487 (3d Cir. 2007) ("This Court recently rejected the argument that an arrest made in violation of state law is *per se* unreasonable under the Fourth Amendment.") (citing Laville, 480 F.3d at 192); United States v. Green, 178 F.3d 1099, 1106 (10th Cir.1999) ("the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended."); Abbott v. City of Crocker, 30 F.3d 994, 998 (8th Cir. 1994) (violation of state law does not necessarily constitute a violation of the Fourth Amendment); Pasiewicz v. Lake County Forest Preserve District, 270 F.3d 520 (7th Cir. 2001) ("a violation of a state statute is not a *per se* violation of the federal constitution"); Moore, 128 S. Ct. at 1606 ("incorporating state-law arrest limitations into the Constitution would produce a constitutional regime no less vague and unpredictable than the one we rejected in Atwater [v. Lago Vista, 532 U.S. 318 (2001)]").

7

Instead, state law is but one of any number of factors that should be considered is assessing the totality of the circumstances and the reasonableness of an arrest with the particular context in question. Laville, 480 F.3d at 191 & n. 2 (collecting cases in support).

The weight of authority applies a totality of the circumstance test in assessing the reasonableness of an extra-jurisdictional arrest. Atwell, 470 F. Supp.2d at 574. This approach considers a number of factors and weighs an individual's interest in freedom from unreasonable seizures against society's interest in protecting citizens from criminal conduct. Id. Of course, central to the determination of reasonableness of any arrest is the existence of probable cause. Moore, 128 S. Ct. at 1605 ("We are convinced that the approach of our prior cases is correct, because an arrest based on probable cause serves interests that have long been seen as sufficient to justify the seizure."); United States v. Watson, 423 U.S. 411, 417 (1976) ("The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony . . . ."); Atwell, 470 F. Supp.2d at 574. Additional factors to consider include: the location where the offense originated; whether the arrest occurred between state lines or lines of the same political subdivisions; the degree of the officer's compliance with state law; the officer's knowledge of his authority to effect the arrest and any purposeful disregard thereof; the state's interest in effectuating the arrest; and any state interest underlying any statutory limitation on an officer's territorial jurisdiction. Atwell, 470 F. Supp.2d at 574-75 (collecting authority for each factor).[2]

Here, defendant concedes that probable cause existed for his arrest. In addition, the unfolding trafficking offense originated in Pennsylvania and was planned to end there. Also, the

---

[2] It has been widely acknowledged that compliance with state law is one of the relevant factors in determining whether police conduct comported with the Fourth Amendment. United States v. Baker, 16 F.3d 854, 856 n. 1 (8th Cir.1994) ("the question of compliance with state law may well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes."); Laville, 480 F.3d at 193; United States v. Mikulski, 317 F.3d 1228, 1232 (10th Cir. 2003) (same). And whether the officers unknowingly or purposefully disregarded the extent of their authority may be of particular significance in ascribing the weight to be accorded to this factor. Mikulski, 317 F.3d at 1232.

8

officers were authorized at common law and by Ohio's Uniform Fresh Pursuit Act to arrest defendant in Ohio. The troopers only non-compliance was in failing to comply with Ohio R. C. § 2935.31, which required them to bring Sed before an Ohio district justice to determine if the arrest was valid. This technical violation is at the very least mitigated by the fact the corporal in charge honestly believed Sed and Grannison had re-entered Pennsylvania and the troopers were in compliance with Pennsylvania law by transporting him less than a mile to the Sharon Police station and taking him before a Pennsylvania district justice in due course. It is further apparent that the officers utilized appropriate process for obtaining a warrant for Grannison's residence, which by implication further undermines the import of any failure to have an Ohio peace officer pass on the validity of Sed's arrest. Similarly, the troopers obtained a warrant to search Grannison's car and obtain the crack cocaine from the back seat after it had been towed to the station. Thus, the troopers complied with procedural formalities in all other pertinent aspects and district justices from both jurisdictions necessarily had to pass on whether the underlying events gave rise to probable cause for search warrants. In addition, Pennsylvania had a significant interest in the arrest because all the offenses originated in and either ended in or were planned to end in Pennsylvania. And the offenses involved the movement of large amounts of narcotics into the Pennsylvania. Finally, the purpose of limiting an officer's extra-territorial actions beyond state lines is to promote comity and respect for separate spheres of state sovereignty, a matter that bears little on Sed's individual constitutional rights.

For these reasons, the totality of the circumstances strongly supports the reasonableness of Sed's arrest and demonstrates that it was constitutional for Fourth Amendment purposes. Consequently, defendant Sed's motion to suppress evidence and dismiss count four properly has been denied.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:	Troy Rivetti, AUSA

Stephen M. Misko, Esquire
106 South Main Street
Suite 704
Butler, PA 16001